# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**JENNISSE LÓPEZ-CORREA**

**Petitioner,**

**v.**

**UNITED STATES OF AMERICA**

**Respondent.**

**CIVIL NO. 18-1930 (GAG)**

**(related Crim. No. 09-233 (GAG)**

## <u>OPINION AND ORDER</u>

It is a fundamental value of our democratic society that "it is far worse to convict an innocent [woman] than to let a guilty [woman] go free." <u>In re Winship,</u> 397 U.S. 358, 372 (1970) (Harlan, J., concurring). Equally foundational is the federal judiciary's mandate that courts provide fair and impartial justice to all. In the present case, this paramount commitment requires addressing head-on how our judicial system failed a female victim of sexual abuse diagnosed with the Battered Women Syndrome (BWS).

Ms. Jennisse López-Correa ("Petitioner" or "Ms. López-Correa") pled guilty to aiding and abetting her captor and abuser, Mr. Joseph Acevedo-Maldonado, in the production of child pornography, in violation of 18 U.S.C. §§ 2251(a) and 2, an offense for which she lacked the requisite criminal intent. As *post-conviction* evidence overwhelmingly demonstrates, Mr. Acevedo-Maldonado exercised near total control over Ms. López-Correa's life, from the beginning of their relationship throughout the period during which the offenses befell and until her arrest. He beat her, sexually assaulted her and physically and emotionally threatened her. Ms. López-Correa did not fully understand the consequences, pleading guilty by way of a plea agreement, and her counsel, knowing of her history of violent abuse, facilitated an involuntary plea and failed to present a timely

Civil No. 18-1930 (GAG)

duress and BWS defense. If said defenses would have been opportunely raised and had Ms. López-Correa exercised her right to go to trial, the Court is convinced beyond cavil that no reasonable jury would have found her guilty. A jury, rather, would have seen Ms. López-Correa as a helpless victim, not as a sexual predator.

The Court already held that Ms. López-Correa's conditions for supervised release should be terminated, United States v. López-Correa, 164 F. Supp. 3d 266 (D.P.R. 2016), yet has not amended the judgment in order to retain jurisdiction and, thus, allow Petitioner to file the current petition to vacate, set aside or alter judgment under 28 U.S.C. § 2255. The Court *sua sponte* encouraged Ms. López-Correa, and even the Government (or "Respondent") itself, to consider filing this motion to avoid an egregious miscarriage of justice. For almost ten years, Ms. López-Correa has suffered at the expense of our system's failure to recognize and treat her as a victim, the Court included. Today, this agony must finally come to an end.

The Court now finds that Ms. López-Correa established both freestanding and gateway actual-innocence claims because her conviction, without the required *mens rea*, offends the Due Process Clause and her trial attorney provided ineffective legal assistance. The undersigned is cognizant that its holding is extraordinary and calls for an exceptional and ground-breaking solution. After carefully considering the submissions to the Court, specifically all *post-conviction* testimony and record evidence, the Court hereby **GRANTS** the petition under 28 U.S.C. § 2255 at Docket No. 40 and **VACATES** Ms. Jennisse López-Correa's criminal conviction in Crim. No. 09-233 (GAG) at Docket No. 71.

## I.   Factual and Procedural Background

The Court's Opinion and Order relating to Ms. López-Correa's motion to reduce her thirty years of supervised release, López-Correa, 164 F. Supp. 3d at 266, delved into evidence submitted

Civil No. 18-1930 (GAG)

to the record post-sentencing and focused on how psychological treatment during this period revealed years of trauma and abuse. Nonetheless, the Court briefly addressed her personal story and the procedural background that led to said request. Presently, the Court will expound a more complete picture and focus its attention to the array of new evidence that came to light post-conviction. See Schlup v. Delo, 513 U.S. 298, 324 (1995); Bousley v. United States, 523 U.S. 614 (1998).

A.  Criminal Case No. 09-233

On July 9, 2009, a federal grand jury indicted Ms. López-Correa and Mr. Acevedo-Maldonado for aiding and abetting each other in the production of child pornography involving a fourteen-year old female, in violation of 18 U.S.C. §§ 2251(a) and 2. (Crim No. 09-233 (GAG), Docket No. 1). According to the Government's version of facts in the Plea Agreement, in February 2009, the U.S. Immigration and Customs Enforcement (ICE)'s Cyber Crimes Group received information from the Puerto Rico Police as to co-defendants' arrest in relation to other minor victims in a Commonwealth criminal investigation. (Crim No. 09-233 (GAG), Docket No. 68 at 9). After a forensic examination of their computer hard-drive, video images of then fourteen-year old minor L.G. were found engaging in sexual intercourse and oral sex with Mr. Acevedo-Maldonado. Id. The video was recorded by Ms. López-Correa and Mr. Acevedo-Maldonado while using a web-camera in the latter's apartment. Id.

On July 16, 2009, at the arraignment hearing, Ms. López-Correa pled not guilty to the sole count brought against her. (Crim No. 09-233 (GAG), Docket No. 21).

1.  Change of Plea Hearing

After the initial hearings, on August 21, 2009, then defense counsel Rosa Bonini-Laracuente ("Attorney Bonini-Laracuente"), informed the Court that Ms. López-Correa was being treated by

3

psychiatrist Dr. Jorge R. Robles Irizarry and evaluated by clinical psychologist Dr. Carol Romey. (Crim No. 09-233 (GAG), Docket No. 31). According to the emergency motion, these medical professionals were considering Ms. López-Correa's mental competency because "her mental state of mind may be a defense" and "to ascertain her state of mind during the time of the relationship with co-defendant . . . which impair[ed] her from personally helping in her defense." Id. For this reason, her defense attorney requested to administer and submit to the record a psychiatric evaluation by Dr. Romey. (Crim No. 09-233 (GAG), Docket No. 32). The Court granted said request. (Crim No. 09-233 (GAG), Docket No. 37). The need for Dr. Romey's evaluation was further stressed at a status conference held on October 29, 2009. (Crim No. 09-233 (GAG), Docket No. 42). On November 16, 2009, a second status conference was held, but there was no mention of the pending psychiatric evaluation. Instead, Ms. López-Correa's defense counsel informed that her client was interested in a plea deal. (Crim No. 09-233 (GAG), Docket No. 43). On December 17, 2009, while plea negotiations were underway, counsel notified the Court that Ms. López-Correa suffered a "mental health crisis" which resulted in her hospitalization. (Crim No. 09-233 (GAG), Docket No. 43). In evidence submitted *post-conviction*, the Court learned that Ms. López-Correa had attempted to commit suicide with a robe and remained hospitalized in San Juan Capestrano Hospital -a mental institution- until the end of December 2009. (Docket No. 34-2). (Crim No. 09-233 (GAG), Docket Nos. 124 at 14).

Without Dr. Romey's report having been finalized or submitted to the Court, the Government sent Ms. López-Correa a proposed plea agreement on January 14, 2010. (Crim No. 09-233 (GAG), Docket No. 59). This occurred only two weeks after being released as an in-patient at a psychiatric institution. The final agreement contemplated a guilty plea for the sole count in the indictment, with a mandatory minimum sentence of fifteen years, and precluded all requests other than the statutory

**Civil No. 18-1930 (GAG)**

minimum, except for a potential sentence reduction based on substantial assistance. (Crim No. 09-233 (GAG), Docket No. 68).

On January 22, 2010, Ms. López-Correa pleaded guilty to one count of aiding and abetting in the production of child pornography involving a female minor, pursuant to 18 U.S.C. §§ 2251(a) and 2. (Crim No. 09-233 (GAG), Docket Nos. 70, 71). During the colloquy, Ms. López-Correa admitted to being depressed as a result of the indictment and admitted to taking anti-depressants, such as Paxil and Seroquel, but did not recall the name of all her medications. (Crim No. 09-233 (GAG), Docket No. 240 at 5). Although she answered "No" as to whether the medications somehow affected her ability to understand the procedure against her, the Court today acknowledges that it failed to ask follow-up questions as to medication dosage, *e.g.* when she had last taken them or whether they had any secondary effects. (Crim No. 09-233 (GAG), Docket No. 240 at 6).

*Post-conviction* evidence has revealed that Ms. López-Correa had been taking Zoloft (100mg), Abilify (10mg), Restoril (30mg) and Ativan between the date counsel announced an interest in plea negotiations and finally agreeing to one. (Docket No. 34-2). These drugs are used to treat major depressive disorder, panic or anxiety disorder and post-traumatic stress disorder or insomnia. (Docket No. 40 at 31-32). In addition to Paxil and Seroquel, the *day before* her change of plea hearing, Petitioner had also been prescribed Clonazepam, which is used primarily to treat seizure disorders, as well as to handle anxiety and depression. (Docket Nos. 1-8; 40 at 12).

A critical moment arose during the colloquy when the Court asked Ms. López-Correa: "Nobody forced you to commit this offense with Joseph Acevedo? You voluntarily participated in the commission of the offense?" Her defense counsel interrupted and stated: "Mrs. Jennisse López, when this case started, she was diagnosed with *post traumatic syndrome due to domestic violence*. That's why it's so hard for her to say *that it was voluntarily*, because she was psychologically

Civil No. 18-1930 (GAG)

abused." (Crim No. 09-233 (GAG), Docket No. 240 at 18) (emphasis added). The Court then highlighted that this was a factor to be considered for sentencing, yet re-phrased the question and asked Ms. López-Correa if she "volunteered and . . . *went along* with what Mr. Joseph Maldonado asked [her] to do, to participate in that offense." Id. To which she responded affirmatively. Following this final set of questions, the Court accepted Ms. López-Correa's guilty plea and convicted her. (Crim No. 09-233 (GAG), Docket No. 240 at 71).

At this juncture, the Court notes the following documents submitted to the record *post-conviction* and for purposes of Ms. López-Correa's motion to vacate: (1) an e-mail exchange between Ms. López-Correa's current attorney and her former counsel and (2) a statement under penalty of perjury from the Petitioner where she recounts her experience during the colloquy. In the messages between counsel, Attorney Bonini-Laracuente stated that she believed that Petitioner's failed suicide attempt "did not influence her decision to enter into a plea" and that the plea agreement was presented "after January, when she was feeling better and taking her medications." (Docket No. 1-2 at 1). Furthermore, counsel expressed that:

> The Defense of Battered Women's Syndrome was an alternative to her defense, which we discussed with her since the beginning of the case, but she preferred a plea where she would not be exposed to jail if found guilty after a trial. This Syndrome was part of the evaluation from Dr. Romey and was brought at her sentencing hearing. Jennisse is a very suffered women, mentally battered by her mother and by her boyfriend, Joseph Acevedo (co-defendant) and has suffered all her life, and it was not wise to take her to trial, because she was not mentally fit to go to trial.

Id. As to Ms. López-Correa's statement under penalty of perjury, she remarked that: "Before pleading guilty, and afterwards, I was traumatized and depressed. I worked at overcoming the depression and the anxiety and to once again be functional, with the help of psychologists, psychiatrists, medications, and even the probation officers." (Docket No. 1-3 at 2). Moreover, she stated: "I pled guilty because at that moment, I understood I had no alternative. I felt guilty,

**Civil No. 18-1930 (GAG)**

disgusting, dirty because of what he did to me and forced me to do. The only thing that mattered to me was that he not again do what he did to anybody else." Id. As to her state of mind during the colloquy, she admitted that: "The day that I went to court to plead guilty, I was terrified and medicated. I didn't dare to explain anything." (Docket No. 1-3 at 2).[1]

B. Sentencing Hearing

Ms. López-Correa's sentencing hearing was originally set for May 3, 2010 but was suspended and continued three times until August 13, 2010. (Crim No. 09-233 (GAG), Docket Nos. 70, 78, 91, 114). Before the sentencing hearing, on July 8, 2010, Ms. López-Correa testified at co-defendant Mr. Acevedo-Maldonado's criminal trial presided by the undersigned judge. (Crim No. 09-233 (GAG), Docket No. 240 at 154). When offering testimony, she explained her relationship with Defendant Acevedo-Maldonado and described the events that led to the arrest. Id. As the Court remarked during Ms. López-Correa's sentencing hearing, the jury during Defendant Acevedo-Maldonado's trial found "her testimony definitely credible" and commented that "[s]he was crying. Felt very troubled" to the point "she had to stop testifying for a few minutes until she got her composure together." (Crim No. 09-233 (GAG), Docket No. 239 at 35). The Court understood this to be related to "the domestic violence situation she's been living with. And not only was she testifying about it, but this is something . . . she finds difficult to cope with." Id.

Furthermore, before being sentenced, the Court *finally* received Dr. Romey's "Psychodiagnostics Assessment Report" (PAR), alongside the statutorily required U.S. Probation Office (USPO)'s Amended Pre-Sentence Report (PSR), which included an ETHOS program evaluation, and defense counsel's Sentencing Memorandum. (Crim No. 09-233 (GAG), Docket Nos.

---

[1] While this statement is self-serving, the Court is not affording the same any controlling weight for the present ruling. The same, however, is consistent with all the independent information of record.

Civil No. 18-1930 (GAG)

117-1, 124, 128, 272-4). These submissions provide detailed background information to Ms. López-Correa's traumatic life and severe mental health conditions. The Court highlights the following unsettling and disheartening details about her life.

Ms. López-Correa's grandfather sexually molested her several times when she was ten years-old. (Crim No. 09-233 (GAG), Docket Nos. 124 at 11). This abuse as a child psychologically impacted her development as a teenager and young adult. At age sixteen, she got pregnant and felt compelled to marry the baby's father, Mr. Edwin Rivera. (Crim No. 09-233 (GAG), Docket Nos. 124 at 11-12). However, she separated after only three months and officially divorced years later. Id. Ms. López-Correa's first partner was a drug addict and abusive, who devised an illegal scheme to steal money from her parents. (Crim No. 09-233 (GAG), Docket Nos. 117-1 at 6-7). When Ms. López-Correa's father learned about said scheme he confronted Mr. Rivera. He became enraged and shot at everybody in the López-Correa family household. (Crim No. 09-233 (GAG), Docket Nos. 124 at 12). Mr. Rivera was arrested and prosecuted. Id. After this incident, Petitioner moved to a suburban housing project in the metro area and continued her undergraduate studies, while her parents went back to the countryside with Ms. López-Correa's daughter. Id.

It is at this time when a 17 year-old López Correa met her *de-facto* captor, 40 year-old Acevedo-Maldonado. Id. Their first interaction gives a glimpse of what the future wretchedly held. Mr. Acevedo-Maldonado saw Ms. López-Correa on the street, followed her to the car, catcalled her, told her she looked like a model, invited her to his car and asked her out on a date. Id. After their first date, Mr. Acevedo-Maldonado forced himself into the room and sexually assaulted her. (Crim No. 09-233 (GAG), Docket No. 272-4 at 2). Ms. López-Correa never returned to her apartment by herself. Id.

Civil No. 18-1930 (GAG)

During the course of their relationship, she was sexually assaulted and sodomized on numerous occasions, physically and verbally beaten, persistently drugged, and stalked every time she left the house. (Crim No. 09-233 (GAG), Docket Nos. 124 at 12; 272-4 at 10-14). According to her testimony, Mr. Acevedo-Maldonado effectively took her hostage and described that failing to obey his instructions and demands resulted in persistent abuse. For example, he was obsessed with cleanliness in the apartment and if Ms. López-Correa did not clean as demanded she was punished by being deprived of food, being hit on the head, choked and prohibited from attending school or work. (Crim No. 09-233 (GAG), Docket Nos. 117-1 at 10-12, 15-16). During her sessions with Dr. Romey, she explained her feelings during this vicious relationship:

> I can't believe how hypnotized I was by him. It was total control of my body and mind, that I wouldn't even know how to choose anything nor to do anything without first asking his permission. And if I did it I felt nervous, it was best that I didn't do anything because I would be fearful-terrorized that if he found out about something that I did without first asking him permission, he could hit me and he wouldn't let me go to the University. I didn't speak to anyone, I was afraid of everyone. I felt like it wasn't me, like if what I was before I met him could no longer be. I felt inhibited about everything.

(Crim No. 09-233 (GAG), Docket No. 272-4 at 9). Even though she lived through these tribulations, Ms. López-Correa managed to receive a B.A in pre-school and primary education and passed the Commonwealth's licensing teacher examination. (Crim No. 09-233 (GAG), Docket No. 272-4 at 9).[2]

Notably, after twelve sessions interviewing and treating Ms. López-Correa, Dr. Romey concluded that she had "a serious level of self-debasement and [her] responses . . . accentuate negative feelings towards herself." (Crim No. 09-233 (GAG), Docket Nos. 117-1 at 31). Furthermore, Dr. Romey highlighted the "extreme conditions and experiences that have shaped her

---

[2] Since Ms. López-Correa's arrest, she has lived in with her parents and daughter at their family home in the countryside. (Crim No. 09-233 (GAG), Docket Nos. 124 at 13).

**Civil No. 18-1930 (GAG)**

life circumstances. The contradictions of being so involved in a pathological relationship with co-defendant . . . [while at the same time] being a university student and becoming a certified teacher are a source of great distress, shame, confusion and despair." Id. at 32. As to Ms. López-Correa's relationship, Dr. Romey emphasized that it had all "elements of *pathological bonding* often found in domestic violence." Id. (emphasis added). As to specific gender violence factors, the psychologist determined that their relationship exhibited: (1) restricted freedom of movement and total control of economic resources; (2) coerced and involuntary interpersonal relationships through family alienation, obligation to commit immoral acts and overt violence; (3) continued intimidation acts that fostered phycological vulnerability; (4) regular administration of controlled substances to subordinate her will, and (5) increased domination tactics. (Crim No. 09-233 (GAG), Docket Nos. 117-1 at 33-36).

These assessments coincide with the Amended Pre-Sentence Report's details about Ms. López-Correa's mental health condition. (Crim No. 09-233 (GAG), Docket No. 124). According to the ETHOS's Intake Assessment Report, dated a week-before her change of plea hearing (January 14, 2010), she was suffering at the time from severe mayor depressive disorder, anxiety disorder, and post-traumatic stress disorder, among other health conditions. Id. at 14.

Attorney Bonini-Laracuente submitted to the Court a sentencing memorandum discussing Lopez-Correa's personal background and mental health conditions. Nevertheless, the Court underscores that this information should have been presented earlier in the case, notably, any duress or *mens rea* defense arguments. (Crim No. 09-233 (GAG), Docket No. 128 at 6-7). Moreover, the Court itself should have addressed the matter more thoroughly. In the sentencing memorandum, defense counsel posited that "duress may coincide with hostage-taking like in the present case" and Ms. López-Correa "will like to use this defense to clear her name completely of charges." (Crim No.

Civil No. 18-1930 (GAG)

1   09-233 (GAG), Docket No. 128 at 6-7). After discussing the applicable 18 U.S.C. §3553(a)

2   mitigating factors, the defense requested a sentence of time-served and five years of supervised

3   released. Id. at 16. The Government, on its part, requested sentence below the applicable statutory

4   minimum and Sentencing Guidelines recognizing Ms. López-Correa's substantial assistance and

5   recommended the Court impose a sentence of seven years imprisonment. (Crim No. 09-233 (GAG),

6   Docket No. 129).

7       On August 13, 2010 the Court held the sentencing hearing and sentenced Lopez-Correa to

8   time-served, followed by thirty years of supervised release. (Crim No. 09-233 (GAG), Docket Nos.

9   131, 132). At the sentencing hearing, Ms. López-Correa addressed the Court, and described how Mr.

10  Acevedo-Maldonado maltreated her and how she felt helpless:

> THE DEFENDANT: First of all, I want to say repent very much for what happened.
> It was not in my control to be able to stop that. I was afraid for my
> and for that of my family. He would force me to look while he was with those girls.
> If I said something, he would beat me. I feel very bad about what happened[.]
>
> [. . .]
>
> THE DEFENDANT: He created -- I mean, he led me to believe, to think like that was
> not wrong. But I, inside of me, I knew that that was not right. My only solution was
> to try to remain outside of the house at all times. By working and studying -- working
> and studying at the same time, as well. *I didn't want to go to my house.* I felt alone.
> I'm receiving therapy now and where I'm being able to get all of this that I lived
> through out of my system. And the way I am now I would say that I would do
> whatever is possible or impossible so that this would never happen again. I am very
> repentant for everything that has happened. *This man had the capacity to dominate
> me.* And I'm still working with that, all of those feelings. I understand now that that
> was not right, that he was an abuser, an abuser in every sense of the word. Sexual,
> mental, emotional. And I repeat: I am very repentant and I do not want this to ever
> happen again. And I *thank God* that things happened the way they did because I know
> that this *would not have stopped*. He would not have stopped. But because it happened
> the way it did and we were arrested, *I feel quite relieved* knowing that this isn't going
> to happen again.
>
> [. . .]
>
> THE COURT: Let me put it this way: Would you have been able -- he was arrested
> approximately, I would say, a year and-a-half ago. If the arrest had not taken place,
> would you have been able to leave and go back with your parents or stop doing what
> you were doing?

Civil No. 18-1930 (GAG)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

THE DEFENDANT: It was always my desire. But the way I was feeling at that moment, yes, *I think it would have continued*.

THE COURT: So in other words, what you're telling me, you did not have your own willpower to stop that relationship with Mr. Acevedo-Maldonado.

THE DEFENDANT: That's right.

(Crim No. 09-233 (GAG), Docket No. 239 at 24-26) (emphasis added). Before sentencing Petitioner, the undersigned recognized that "it is clear that she herself is a victim" and that this was the "most aggravated [domestic violence case] I've seen." Id. at 29-30.[3]

C.   Supervised Release, Post-Sentencing Reports and subsequent Hearings[4]

On September 2, 2014, the Court, on its own initiative, ordered the U.S. Probation Office to file a sealed, *ex parte* report as to Ms. López-Correa's rehabilitation progress, including mental and sex offender evaluation and treatment reports. (Crim No. 09-233 (GAG), Docket No. 164). The Government opposed and, as a result, the Court appointed pro-bono counsels to further evaluate the matter and consider whether reduction of the supervised released term imposed was warranted. Id. at 168. On October 1, 2014, the Probation Officer filed a Mental Health Assessment; Polygraph Report and a recent ETHOS Report. (Crim No. 09-233 (GAG), Docket Nos. 171, 172, 173).

Pro-bono counsels filed a motion to modify Ms. López-Correa's supervised release. Thereafter, the Court held several "Further Reduction of Supervised Release Hearings" to tend said request. (Crim No. 09-233 (GAG), Docket Nos. 183, 188, 191, 209). At these hearings, the Court heard testimony from Ms. López-Correa herself, Dr. Vanessa Berrios-Méndez, who had been Ms.

---

[3] Prior to joining the federal judiciary in 2001, the undersigned worked at the Commonwealth of Puerto Rico Department of Justice. Threat, he collaborated in the administrative creation and coordination of the specialized prosecutor units to attend domestic violence cases. Moreover, as Solicitor General, the undersigned represented the Commonwealth in numerous domestic violence appeals before the Puerto Rico Circuit Court of Appeal and Supreme Court. See e.g. Pueblo v. Ríos Alonso, 156 P.R. Dec. 428 (P.R. 2002) (Official English Translation Not Available).

[4] Most facts contained in this part of the Opinion were discussed in the Court's previous Opinion and Order as to the termination of Ms. Lopez-Correa's supervised released. See United States v. López-Correa, 164 F. Supp. 3d 266 (D.P.R. 2016).

Civil No. 18-1930 (GAG)

López-Correa ETHOS Program psychologist since October 14, 2010, and from attorney Wanda Vázquez-Garced, the then Women's Advocate for the Commonwealth of Puerto Rico.[5] Id. The Women's Advocate subsequently filed an expert report explaining BWS as applied to instant case. (Crim No. 09-233 (GAG), Docket No. 204).

At the supervised release hearing, Ms. López-Correa testified extensively about her abusive relationship with Mr. Acevedo-Maldonado. For example, after explaining how he sexually assaulted her after their first date, she detailed that for around *three months* she was kept "locked up" in his apartment. (Crim No. 09-233 (GAG), Docket No. 196 at 15-16). He then would force her to take illicit drugs, have sex with him and while in the presence of others "intimacy." Id. When asked about what happened if she did not do what Mr. Acevedo-Maldonado wanted, she answered: "[h]e could have even *killed me*. He would hit me on my head, he would beat me on my head. He would leave me without any food to eat. He had me as a *slave*." Id. at 19 (emphasis added). Furthermore, when discussing their living arrangement, Petitioner testified that she would sleep in a separate bedroom because she "couldn't sleep whenever [she] was with him." Id.

When questioned as to why she filmed the minor victims, Ms. López-Correa responded that "he would *force me* to film him while he was with them having sexual relations" because if not "he would beat me and he would *threaten with a pistol* that he had at home. He would grab me by my neck; he would lift me and then he would let fall." Id. at 20-21 (emphasis added).

A final supervised release termination hearing was held on June 24, 2015. At said hearing, Dr. Berríos-Méndez testified about Ms. López-Correa's psychiatric conditions. She specifically mentioned that the Petitioner would call her and the probation officer on a weekly basis during the

---

[5] Since then attorney Vázquez-Garced served as Commonwealth Attorney General and is presently the Governor of Puerto Rico.

1    pre-trial period with suicidal thoughts that moved them to intervene. (Crim No. 09-233 (GAG),

2    Docket No. 196 at 20-21). She stressed that the main reason for these thoughts was Ms. López-

3    Correa's "guilt, the guilt as a result of this case, and the fear of what was ahead during the process

4    of sentencing." (Crim No. 09-233 (GAG), Docket No. 196 at 21).

5         On February 10, 2016, the Court issued an Opinion and Order ruling that Ms. López-Correa's

6    conditions for supervised release conditions be terminated. United States v. López-Correa, 164 F.

7    Supp. 3d 266 (D.P.R. 2016). As explained in the Court's Opinion and Order, after being sentenced,

8    she received treatment from Dr. Berrios-Méndez because of her sex offender status. She fully

9    complied with all of the terms and conditions of her supervised release. Id. at 267. Specifically, as

10   of October 13, 2015, she had successfully completed the minimum term of five years of supervised

11   release required by statute. Id.; (Crim No. 09-233 (GAG), Docket No. 210 at 27-28).

12        The experts that evaluated Ms. López-Correa post-sentencing agree that her behavior during

13   the relevant period "is most consistent with that of a victim of abuse than a sexual predator." Id. at

14   268. As detailed in Opinion and Order, the Court finds it vital to textually reproduce Women's

15   Advocate Vázquez-Garced's expert report conclusion that Ms. López-Correa's behavior was

16   influenced by a process of victimization:

17                Jenisse López-Correa and her behavior were highly influenced by a
                  cruel, constant, and intentional pattern of abuse by way of domestic
18                violence and sexual aggression which placed her in a position of
                  defenselessness and inability to control her will. This situation
19                prevented [her] from being able to make decisions in relation t[o] the
                  abuse or for terminating the relationship. She demonstrated low self-
20                esteem, a feeling of impotence, fear of making decisions, terror [of]
                  abandoning the relation[ship] because of the imminence of a violent
21                reaction from Acevedo-Maldonado.

22   López-Correa, 164 F. Supp. 3d at 268; (Crim No. 09-233 (GAG), Docket No. 204-2 at 10). Similarly,

23   the Court noted, and still holds, that "all of the information contained in the Pre-Sentence Report,

24

Civil No. 18-1930 (GAG)

expert reports, and expert testimony indicate that she was severely and negatively impacted by her involvement, which was the product of coercion and duress rather than her own free will or personal desire." <u>López-Correa</u>, 164 F. Supp. 3d at 268. Dr. Berríos-Méndez specifically determined that Ms. López-Correa is "not the typical case of a sexual offender where there's an intention or a desire to abuse a minor." <u>Id.</u> at 270; (Crim No. 09-233 (GAG), Docket No. 210 at 21-23).

Finally, the Court held that Ms. López-Correa "is actually innocent" and that it "would not have accepted her plea because, as a victim and a sex slave of Acevedo, she did not have the *mens rea* to commit the offense." <u>López-Correa</u>, 164 F. Supp. 3d at. 270. Nevertheless, the undersigned recognized that "because of the way our federal system works, it is very difficult to identify a victim like Ms. López-Correa during the process, especially because of her unique involvement." <u>Id.</u>

## II.   Petition for Habeas Corpus and Motion to Vacate Conviction under 28 U.S.C. § 2255

Following its supervised released ruling, the Court considered whether it could *sua sponte* grant habeas relief and vacate Ms. López-Correa conviction. (Crim No. 09-233 (GAG), Docket No. 222) The Government opposed this course of action. (Crim No. 09-233 (GAG), Docket Nos. 224, 230). Consequently, the Court appointed new pro-bono counsel to explore whether the *habeas corpus* claims could proceed. (Crim No. 09-233 (GAG), Docket Nos. 232, 236).

On December 5, 2018, after "a logistically complicated and psychologically difficult" decision-making process, (Crim No. 09-233 (GAG), Docket No. 256), Ms. López-Correa filed a Motion to Vacate, Set Aside or Correct Sentence, under 28 U.S.C. § 2255. (Docket No. 1). Given that various voluminous exhibits were presented in this case, the original motion was later amended to correct citations and references to the evidence. (Docket No. 40).

Ms. López-Correa has put forward three grounds for relief. First, she advances that the freestanding "actual innocence" doctrine is met because several facts that were not presented at her

**Civil No. 18-1930 (GAG)**

1  change of plea hearing demonstrate that she lacked the requisite *mens rea* to commit the crimes she

2  was accused of and that her participation in these acts was not voluntary. (Docket No. 40 at 5-13).

3  This contention is premised on the fact that to convict a person who lacks criminal intent offends the

4  Due Process Clause. Id. Second, Petitioner argues that she proved a gateway actual-innocence claim

5  based on ineffective assistance of counsel because she entered into an involuntary guilty plea for an

6  offense she did not commit. Id. at 22-33. Finally, Ms. López-Correa avers that ineffective assistance

7  of counsel also occurred because her defense counsel failed to explore and seek duress, coercion and

8  BWS defenses *before* being convicted. Id. at 39-42.

9       The Government opposes the granting of the habeas remedy arguing that Petitioner's motion

10  to vacate is time-barred under the Antiterrorism and Effective Death Penalty Act (AEDPA), 28

11  U.S.C. §§ 2255 *et seq.*, and that the information on which she relies to establish her alleged actual

12  innocence is not new. (Docket No. 17 at 20-23). Second, it posits that, even if timely, Ms. López-

13  Correa cannot establish a free-standing actual innocence claim because her allegations are factual in

14  nature, rather than legal. Id. 23-26. Similarly, the Government avers that Petitioner's change of plea

15  was knowingly and voluntarily, based on facts, and not the result of ineffective assistance of counsel.

16  Id. at 26-29. As to Petitioner's position that duress and BWS defenses were not presented, the

17  Government argues that her defense counsel made sound legal decisions throughout the case and

18  even if these defenses would have been presented it would refute them with damaging evidence. Id.

19  at 29-35. Finally, the Government suggests that if her conviction is vacated Ms. López-Correa would

20  be back at "square one," it could pursue a new trial and request the case be assigned to different

21  judge. Id. at 36.[6]

22

23  _____

[6] Requesting a new trial, as well as, moving for the undersigned's disqualification are issues solely for the
Government to decide as matter of strategy. However, from the Court's perspective, these considerations are
inconsequential to its disposition of the present habeas claim. The undersigned took an oath to uphold the
24  Constitution and Laws of the United States. In doing so, a judge must always rule without favor or fear, applying

Civil No. 18-1930 (GAG)

Thereafter, Petitioner filed a reply arguing that the motion to vacate was timely filed and, even if it were not, her actual innocence and procedural default claims are factual rather than legal, and would excuse any time-barred allegation. (Docket No. 28). Moreover, Ms. López-Correa asserts that reliance upon the finality of a guilty plea ignores the connection between her psychiatric condition and her innocence. Id. at 2. She reiterates that her trial attorney failed to take necessary steps to accomplish the objective of "clearing her name completely." Id.

III.   **Applicable Law and Legal Analysis**

A.   Statute of Limitations

As a threshold matter, the Court addresses the claim that Ms. López-Correa's motion to vacate her conviction is time-barred. In the Opinion and Order previously issued in this case, the Court noted that that the one-year statutory period to file a habeas petition, under 28 U.S.C. § 2255(f)(4), would begin to run from the date of said Opinion. López-Correa, 164 F. Supp. 3d at 270-71. However, at the time, the Court was evaluating whether to convert Ms. López-Correa's post-conviction motion into a petition for a writ of *habeas corpus* without running afoul of the statute of limitations. Id. The underlining analysis for that consideration stemmed from the fact that there is no statute of limitations for an actual innocence claim such as Ms. López-Correa's. See McQuiggin v. Perkins, 569 U.S. 383, 1928 (2013) (stating when "faced with an actual-innocence gateway claim, [a district court] should count unjustifiable delay on a habeas petitioner's part, not as an absolute barrier to relief, but as a *factor* in determining whether actual innocence has been reliably shown.")

---

the unique facts of each case to the applicable law. This is exactly what our Nation's Founding Fathers contemplated in an independent, life-tenured federal judiciary – to do what is right regardless of what another branch of government insists must be done. U.S. CONST. art. 3, §§ 1-3. See THE FEDERALIST NO. 78 at 405 (Alexander Hamilton) (Gideon ed., 2001) ("If, then, the courts of justice are to be considered as the bulwarks of a limited Constitution against legislative [and executive] encroachments, this consideration will afford a strong argument for the permanent tenure of judicial offices, since nothing will contribute so much as this to that independent spirit in the judges which must be essential to the faithful performance of so arduous a duty.")

Civil No. 18-1930 (GAG)

(emphasis added). Ultimately, the Court decided not to act *sua sponte* and allowed Ms. López-Correa's counsel to file the current motion seeking habeas relief and to vacate her conviction. The Court already made an *initial* finding of factual innocence memorialized in the previous Opinion and Order, yet now scrutinizes that ruling under the lens of both freestanding and gateway actual-innocence doctrines. The analysis that follows demonstrates that Ms. López-Correa has made a colorable showing of actual innocence and, as a result, any delay in filing the habeas relief under the Court's advisement is not time-barred. McQuiggin, 569 U.S. at 393 ("Sensitivity to the injustice of incarcerating an innocent individual should not abate when the impediment is AEDPA's statute of limitations.").

B.  Actual Innocence Claim

When discussing the applicable law, the Court bears in mind that Petitioner's actual innocence claims are classified as follows: (1) freestanding actual-innocence based on Due Process violations since she lacked the requisite criminal intent; (2) gateway actual-innocence based on ineffective assistance of counsel for allowing her to enter an involuntary guilty plea; and, (3) gateway actual-innocence claims based on ineffective assistance of counsel for failing to present duress and BWS defenses.

Under an "actual-innocence" claim, a prisoner in custody[7] and sentenced under a federal criminal statute may move to seek collateral review via writ of *habeas corpus*. See 28 U.S.C. § 2255; United States v. Barrett, 178 F.3d 34, 50 (1st Cir. 1999). Relief based on a "freestanding" actual-innocence claim, without any other constitutional violation, has yet to be decided by the Supreme

_____

[7] See Tinder v. Paula, 725 F.2d 801, 803-04 (1st Cir. 1984). Though a petition for *habeas corpus* is only available to a "person in custody," the First Circuit has clearly held that the custody requirement encompasses petitioners on probation and parole, and those subject to "restraints not shared by the public generally" Id. (citing Jones v. Cunningham, 317 U.S. 236, 240 (1963)). For this reason, the Court delayed entering judgement terminating Ms. López-Correa's conditions of supervised released. Hence, she preserved the right to seek collateral review of her conviction.

Civil No. 18-1930 (GAG)

Court or the First Circuit. See McQuiggin, 569 U.S. at 392; Herrera v. Collins, 506 U.S. 390, 400 (1993); David v. Hall, 318 F.3d 343 (1st Cir. 2003). Nonetheless, the doors have been left open. See District Attorney's Office v. Osborne, 557 U.S. 52, 71 (2009) ("Whether such a federal right exists is an open question. We have struggled with it over the years, in some cases assuming, *arguendo,* that it exists while also noting the difficult questions such a right would pose and the high standard any claimant would have to meet."); House v. Bell, 547 U.S. 518, 554 (2006). Freestanding actual-innocence claims are usually accompanied by allegations of procedural or substantive Due Process violations. See Osborne, 557 U.S at 71-74; Herrera, 506 U.S. at 407; see also Powell v. Tompkins, 783 F.3d 332, 337 (1st Cir. 2015) ("It is bedrock that the Fourteenth Amendment protects against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he [or she] is charged." (quoting Winship, 397 U.S. at 364)).

On the other hand, a gateway actual-innocence claim, which entails overcoming procedural hurdles to show a constitutional violation, has been widely recognized to prevent the "miscarriage of justice" of treating an innocent person as convict. McQuiggin, 569 U.S. at 392. This doctrine aims "to balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case." Schlup v. Delo, 513 U.S. 298, 324 (1995); see also Henry J. Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. CHI. L. REV. 142 (1970). The Supreme Court has further underlined that the injustice of convicting an innocent person "has long been at the core of our criminal justice system." Schlup, 513 U.S. at 325.

Pursuant to the gateway doctrine, actual-innocence means "factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623 (1998). To meet this burden, Petitioner

must show, in light of new evidence, that "no reasonable juror would find [her] guilty beyond a reasonable doubt -or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." House, 547 U.S. at 537 (quoting Schlup, 513 U.S. at 327). Moreover, the allegations of constitutional error require "new reliable evidence -whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence- that was not presented at trial." Schlup, 513 U.S. at 324. Ultimately, "the court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." House, 547 U.S. at 538. Finally, a gateway showing of actual-innocence may be established *despite* the fact that the petitioner entered a guilty plea. See Bousley, 523 U.S. at 624. See also Vosgien v. Persson, 742 F.3d 1131, 1136-37 (9th Cir. 2014); Roberts v. Howton, 13 F. Supp. 3d 1077, 1097 (D. Or. 2014).

C.  *Mens Rea*

Petitioner's actual innocence claims primarily relies on the fact that she lacked the criminal intent to commit a sexual exploitation offense. The terms "mens rea," "criminal intent," or "guilty knowledge" have been said "to signify an evil purpose or mental culpability." Morissette v. United States, 342 U.S. 246, 252 (1952); see also Elonis v. United States, 575 U.S. 723 (2015). The idea behind a criminal mental state requirement is that a defendant shall be "blameworthy in mind before [she or] he can be found guilty - an idea that is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." United States v. Morosco, 822 F.3d 1, 19-20 (1st Cir. 2016) (internal quotations marks omitted) (citations omitted). To prove any criminal offense, the Government has the burden of showing both the *actus rea*, the criminal action, omission or possession itself, and the

*mens rea*, guilty state of mind. See <u>Morissette</u>, 342 U.S. at 251 ("[C]oncurrence of an evil-meaning mind with an evil-doing hand.").

Ms. López-Correa pled guilty to one-count of aiding and abetting to sexually exploit a minor, under 18 U.S.C. §§ 2251(a) and (2). The statute states, in relevant part:

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, shall be punished as provided under subsection (e)[.]

18 U.S.C. § 2251(a).

The textual language of this statute has been interpreted to contain "a specific intent element" that "the government [is] required to prove that production of a visual depiction was a purpose of engaging in the sexually explicit conduct." <u>United States v. Lebowitz</u>, 676 F.3d 1000, 1013 (11th Cir. 2012). Particularly, "a defendant must engage in the sexual activity with the specific intent to produce a visual depiction; it is not sufficient simply to prove that the defendant purposefully took a picture." <u>United States v. Palomino-Coronado</u>, 805 F.3d 127, 130-31 (4th Cir. 2015). However, courts do not require that a defendant be "single-minded" in his or her purpose to support a conviction under 18 U.S.C. § 2251(a). See <u>United States v. Morales-de Jesús</u>, 372 F.3d 6, 21-22 (1st Cir. 2004). To prove specific intent as to this offense, the Fourth Circuit listed the following ways: (1) direct evidence of intent; (2) evidence of the defendant's actions, instructions, and descriptions of the visual depictions produced; (3) the number of sexually explicit depictions; and (4) the equipment used. <u>Palomino-Coronado</u>, 805 F.3d at 131-32.

As to aiding and abetting's intent requirement, the Supreme Court has held that "a person aids and abets a crime when (in addition to taking the requisite act) [she or he] intends to

Civil No. 18-1930 (GAG)

facilitate that offense's commission." Rosemond v. United States, 572 U.S. 65, 76-77 (2014). As Judge Learned Hand once said: "To aid and abet a crime, a defendant must not just 'in some sort associate himself [or herself] with the venture,' but also 'participate in it as in something that he [or she] wishes to bring about' and 'seek by his [or her] action to make it succeed.'" Id. at 76 (citing Nye & Nissen v. United States, 336 U.S. 613, 619 (1949). Thus, the intent requirement is satisfied "when a person actively participates in a criminal venture with full knowledge of the circumstances." Rosemond, 572 U.S. at 76; see also United States v. Otero-Méndez, 273 F.3d 46, 51-52 (1st Cir. 2001). Put differently, an aider and abettor is "a person who actively participates in a criminal scheme knowing its extent and character intends that scheme's commission." Rosemond, 572 U.S. at 77.

Thus, to succeed in her actual innocence claims, Ms. López-Correa needs to establish that, more likely than not, any reasonable juror would have had reasonable doubt that she "actively participated . . . with full knowledge of the circumstances" in producing, with specific intent, a visual depiction of a female minor engaging in sexually explicit acts. Id. at 76.

D. Ineffective Assistance of Counsel

"In all criminal prosecutions, the accused shall enjoy the right to . . . the Assistance of Counsel for his [defense]." U.S. CONST. amend. 6. To construe an ineffective assistance claim, a court applies the two-part standard articulated in Strickland v. Washington, 466 U.S. 668 (1984); see United States v. Dunfee, 821 F.3d 120, 128 (1st Cir. 2016). A petitioner "must show that counsel's representation fell below an objective standard of reasonableness, and that the deficient performance prejudiced his defense." Owens v. United States, 483 F.3d 48, 63 (1st Cir. 2007) (internal quotations marks and citations omitted). In the context of a guilty plea, an analysis under FED. R. CRIM. P. 11, requires the court to assess whether: (1) the counsel's performance in advising a guilty plea "fell

**Civil No. 18-1930 (GAG)**

below the standard of performance of reasonable proficient counsel" and (2) if because by said inadequate performance, the petitioner "was induced to enter a guilty plea which [she] otherwise would not have entered." <u>Dunfee</u>, 821 F.3d at 128 (internal quotations marks and citations omitted); <u>see also</u> <u>Missouri v. Frye</u>, 566 U.S. 134, 148 (2012). Finally, the <u>Strickland</u> test mandates "highly deferential judicial scrutiny of counsel's performance and a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>López-Nieves v. United States</u>, 917 F.2d 645, 648 (1st Cir. 1990) (internal quotations marks and citations omitted).

  E. <u>Duress and Battered Woman Syndrome</u>

  Duress is an affirmative defense, developed through common law, that has been recognized in federal courts. <u>See</u> <u>United States v. Bailey</u>, 444 U.S. 394 (1980). In the First Circuit, to establish a claim of duress, a defendant must show that the act occurred under: (1) an immediate threat of serious bodily injury; (2) a well-grounded belief that the threat would be carried out, and (3) a lack of reasonable opportunity to escape or otherwise frustrate the threat. <u>United States v. Bravo</u>, 489 F.3d 1, 10 (1st Cir. 2007). When considering if a defendant has met this standard, a district court "do[es] not examine the defendant's subjective perceptions about whether the threat was likely to be acted upon or whether escape was possible." <u>United States v. Castro-Gómez</u>, 360 F.3d 216, 219 (1st Cir.2004). On the contrary, it "hypothesizes a defendant of ordinary firmness and judgment and asks what such a defendant was likely to have experienced or how such a defendant was likely to have acted." <u>Id.</u> Ultimately, the Supreme Court has observed that "[u]nder any definition of [the defenses of duress or necessity] one principle remains constant: if there was a reasonable, legal alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm, the defenses will fail." <u>Bailey</u>, 444 U.S. at 410 (internal quotations marks and citations omitted).

23

Civil No. 18-1930 (GAG)

In the past decade, numerous state and federal courts have ruled that expert testimony on Battered Women Syndrome (BWS) defense can be relevant to a duress claim. The First Circuit, for example, acknowledged that "testimony about the long-term effects of being battered or domestic violence in general could well be relevant in a case where a defendant claimed that she engaged in criminal activity only because she was forced to by an abusive domestic partner." Navedo-Ramírez, 781 F.3d 563, 567 (1st Cir. 2015); see also United States v. Ramírez, Crim. No. 10-344 (PG), 2012 WL 733973 (D.P.R. Mar. 6, 2012); United States v. Marenghi, 893 F. Supp. 85 (D. Me. 1995). Specifically, in Marenghi, the Court held that expert testimony on BWS may be admitted to support a duress defense. See Marenghi, 893 F. Supp. at 92-93.

In the 1970s, battered women who defended themselves against their husbands' violence began to assert that their actions were justified. See Cynthia K. Gillespie, Justifiable Homicide: Battered Women, Self-Defense, and the Law 9-10 (1989). The term BWS, defined as a "series of common characteristics that appear in women who are abused physically and psychologically over an extended period of time by the dominant male figure in their lives," was coined to explain the reasoning behind these justifications. See Pike v. Guarino, 492 F.3d 61, 66 n. 1 (1st Cir. 2007) (citing State v. Kelly, 97 N.J. 178, 478 A.2d 364, 371 (1984)). BWS has been characterized as "a type of learned helplessness, through which the woman believes that the batterer has complete control of the relationship and that she cannot escape." Id. Notably, "BWS victims do not fit a stereotype. Woman battering crosses all racial, ethnic, religious, socioeconomic, educational, and age groups." Linn v. State, 929 N.W.2d 717, 735 (Iowa 2019). In the context of a legal process, BWS has been historically used to support self-defense claims, through expert testimony, as to the defendant's mental capacity during the criminal act. See Janet Parrish, "Trend Analysis: Expert Testimony on Battering and Its Effects in Criminal Cases" in Department of Justice et al., The

Civil No. 18-1930 (GAG)

Validity And Use Of Evidence Concerning Battering And Its Effects In Criminal Trials pt. II (1996) (hereinafter "DOJ Report"). Expert testimony "elucidate the BWS victim's state of mind and her perception of danger, dispel misconceptions about the patterns of abuse and response, and explain the risks in leaving a battering relationship." Linn, 929 N.W.2d at 744 (citing DOJ report at viii). Similarly, expert testimony can help "explain why BWS victims make false confessions. For instance, some individuals are vulnerable to certain interrogation techniques . . . in ways that put those individuals at a higher risk of falsely confessing." Linn, 929 N.W.2d at 745.

In Marenghi, the Court thoroughly explains the impact of allowing expert testimony of BWS in the context of a duress defense:

> Part of the complexity of the issue is that the distinction between subjective and objective evidence is not as clear . . . This can be demonstrated by changing the "snapshot" of circumstances that is shown to a jury in any particular case. If the jury sees the defendant's circumstances immediately prior to commission of the crime and there is no gun held to her head or other markedly extreme duress, the jury may conclude that any fear of imminent death or violence was unreasonable. However, if the defendant is permitted to pull the camera back to provide the broader picture, so to speak, of her circumstances, the jury could learn of *a pattern of violence, control, and coercion leading up to the criminal act.* Expert testimony could be helpful to explain to the jury how a reasonable person reacts to repeated beatings and emotional abuse. Providing the jury with information of specific incidents of abuse while providing no information about how such treatment can, over time, establish a dynamic where *the threat of abuse hovers over every interaction between the individuals, even if such threat is not always articulated,* would give the jury only half of the story. In effect, this expert testimony may be characterized as explaining how a reasonable person can nonetheless be trapped and controlled by another at all times even if there is no overt threat of violence at any given moment.

Marenghi, 893 F. Supp. at 94-95 (footnotes omitted) (emphasis added). In recent years, building on cases like Marenghi, two appellate federal courts have expanded the probative value of BWS and duress expert testimony. See United States v. López, 913 F.3d 807 (9th Cir. 2019); United States v. Nwoye, 824 F.3d 1129 (D.C. Cir. 2016). The Nwoye decision, authored by now Associate Justice Brett Kavanaugh, ably explains the importance of "reasonableness" in the duress defense and how

**Civil No. 18-1930 (GAG)**

BWS expert testimony helps "identify any aspects of the defendant's 'particular circumstances' that can help the jury assess the reasonableness of her actions." Nwoye, 824 F.3d at 1137.

When assessing the "imminent-harm prong," the D.C. Circuit stressed that BWS victims "are often hypervigilant to cues of impending danger and accurately perceive the seriousness of the situation before another person who had not been repeatedly abused might recognize the danger." Nwoye, 824 F.3d at 1137 (quoting Lenore E.A. Walker, Battered Women Syndrome and Self-Defense, 6 NOTRE DAME J.L. ETHICS & PUB. PO'Y 321, 324 (1992).[8] For this reason, it concluded that "[r]emarks or gestures that may seem harmless to the average observer might be reasonably understood to presage imminent and severe violence when viewed against the backdrop of the batterer's particular pattern of violence." Id. at 1137. On the other hand, when considering "the no-reasonable-alternative prong," the Nwoye decision posits that "battered women face significant impediments to leaving abusive relationships" and those "who leave their abusers risk a retaliatory escalation in violence against themselves or those close to them-sometimes termed 'separation abuse.'" Id.

Finally, in terms of an ineffective assistance of counsel claim, the Nwoye and the Dando v. Yukins, 461 F.3d 791 (6th Cir. 2006) decisions ultimately held that an attorney's failure to introduce expert testimony on BWS *prejudiced* the defendant's defense. In the Dando case, although the defendant pled guilty to robbery and other related charges, she had informed the attorney of her "a long history of violent sexual and physical abuse," and that her co-defendant "beat her" and "threatened to kill her" before participating in the robberies. Dando, 461 F.3d at 798. Defendant Dando "even requested a consultation with a mental health expert before entering her plea." Id. The

---

[8] The D.C. Circuit describes the duress defense as a two-element test, yet the "reasonableness" component comprises two distinct elements. Nwoye, 824 F.3d at 1135. Hence, said test is the functional equivalent of the First Circuit's three-part test.

Civil No. 18-1930 (GAG)

1   Sixth Circuit held that "the fact that Dando received a relatively lenient sentence in exchange for her

2   no contest plea does not render the failure to investigate [BWS] and duress a sound professional

3   judgment." <u>Dando</u> 461 F.3d at 799-800.

4          In addition to these legal arguments, underneath Ms. López Correa's case lies another

5   atrocious truth: Puerto Rico suffers from a gender-based violence epidemic. <u>See</u>

6   Jodie G. Roure, <u>Gender Justice in Puerto Rico: Domestic Violence, Legal Reform, and the Use of</u>

7   <u>International Human Rights Principles</u>, HUM. RIGHTS Q. 790, 817 (2011). In 2003, Puerto Rico had

8   "the sixth highest rate of femicide per one million among fourteen countries in the Americas, and .

9   . . the seventh highest rate worldwide." <u>Id.</u> at 797. Around the years that Ms. López-Correa

10  practically lived as Mr. Acevedo-Maldonado's captive, "178 women were killed by their partners or

11  ex-partners on the island." <u>Id.</u> This situation has only worsened in recent years. In the aftermath of

12  hurricane María, domestic abuse complaints and restraining orders have been soaring. <u>See</u> Jodie G.

13  Roure, <u>Immigrant Women, Domestic Violence, and Hurricanes Irma and María in Puerto Rico:</u>

14  <u>Compounding the Violence for the Most Vulnerable</u>, 20 GEO. J. GENDER & L. 631 (2019). Mindful

15  of this appalling reality, the Court now evaluates Ms. López-Correa's habeas motion to vacate her

16  conviction.

17          F.   <u>The Case of Ms. López-Correa</u>

18          Ms. López-Correa has lived a cycle of sexual, physical and psychological abuse since

19  childhood and through her teenage and young adult years. She has consistently provided credible

20  written and oral testimony about these facts. (Crim No. 09-233 (GAG), Docket No. 117-1; 196; 239;

21  272-4 ) and (Docket No. 1-3). Similarly, every psychological and psychiatric health evaluation that

22  Ms. López-Correa has been submitted to further corroborates this reality. (Crim No. 09-233 (GAG),

23  Docket Nos. 117-1, 124, 171, 172, 173; 272-4). As *post-conviction* expert testimony has revealed,

24

Civil No. 18-1930 (GAG)

during the course of her relationship with Mr. Acevedo-Maldonado, Petitioner was introduced to illicit drugs, pedophilia and voyeurism. She was even kept as a prisoner in his basement apartment for months. (Crim No. 09-233 (GAG), Docket Nos. 124 at 12; 196 at 15-21; 272-4 at 10-14). For around seven years, Mr. Acevedo-Maldonado exercised near total control over every aspect of Ms. López-Correa's life as she was basically his sex slave. López-Correa, 164 F. Supp. 3d at. 270. Hence, it comes as no surprise that Ms. López-Correa "went along" with his threats and was forced to film this disturbed man having sex with underage girls. (Crim No. 09-233 (GAG), Docket No. 239 at 24) ("He would force me to look while he was with those girls. If I said something, he would beat me."); (Crim No. 09-233 (GAG), Docket No. 196 at 20-21 ("[H]e would force me to film him while he was with them having sexual relations" because if not "he would beat me and he would threaten with a pistol that he had at home. He would grab by my neck; he would lift me and then he would let fall.")).

Petitioner obeyed Mr. Acevedo-Maldonado's every command because she was continuously scared for her life. According to Dr. Berrios-Méndez's *post-conviction* expert testimony, Ms. López-Correa was "not the typical case of a sexual offender where there's an intention or a desire to abuse a minor." López-Correa, 164 F. Supp. 3d at. 270; (Crim No. 09-233 (GAG), Docket No. 210 at 21-23), but rather that of victim who had "fear for her life, fear to die" and "fear to harm her daughter because many times [Mr. Acevedo-Maldonado] threatened her that he was going to kill her daughter." (Crim No. 09-233 (GAG), Docket Nos. 210 at 22; 23 and 30). These descriptions squarely fit that of a battered woman, who was subject to a cycle of abuse and coercion. Both Women's Advocate Vázquez-Garced and Dr. Romey's *post-conviction* expert reports firmly concluded it. See López-Correa, 164 F. Supp. 3d at. 268 (Her behavior "is most consistent with that of a victim of abuse than a sexual predator."). Bottomline, as long as Petitioner continued to live with her abuser, she was neither free to act nor refuse his demands and obsessions.

Civil No. 18-1930 (GAG)

In opposing Petitioner's freestanding actual-innocence claim, the Government argues that this doctrine has yet to be applied and, more so, her contention is "factual, not legal." In other words, for Respondent, Ms. López-Correa is not denying that she acted with "the requisite intent" but rather she was forced to participate. (Docket No. 17-1 at 23-24). Hence, it puts forward that she has -at best- a duress defense, which is insufficient to meet the high actual-innocence standard. Id. at 24.

The Court strongly disagrees with the Government's position. First, as mentioned at the outset of this Opinion and Order, extraordinary cases call for exceptional and ground-breaking solutions. Justice and fairness require recognizing the judicial system's faults and correcting them accordingly.[9] Additionally, the Court construes Ms. López-Correa's coerced actions as lacking "specific intent" to record sexual acts, coupled with the fact, that she did not share Mr. Acevedo-Maldonado's gratification in doing so. Morosco, 822 F.3d at 19-20. Plainly, she *lacked the criminal intent* to "facilitate" and "bring about" the committed offense. Rosemond, 572 U.S. at 76. Each post-conviction *expert and scientific testimony* issued on this case, whether that of Dr. Romey, Dr. Berrios-Méndez or Women's Advocate Vázquez-Garced, point to that direction.

The Court holds that Ms. López-Correa is not an aider and abettor because, more likely than not, any reasonable juror would have reasonable doubt that she had "full knowledge of the circumstances" surrounding these deviant acts and lacked the "blameworthy mind" to abuse minors by filming an explicit visual depiction. Rosemond, 572 U.S. at 76-77; House, 547 U.S. at 537. To convict a victim of sexual exploitation for the same crimes as her abuser and captor, under the present circumstances, violates the Due Process Clause. Winship, 397 U.S. at 364. Consequently, Petitioner

---

[9] In a recent civil case, District Judge William G. Young emphasized the importance about "our American ideal of fairness." Peña-Martínez v. U.S. Dep't of Health & Human Servs., Civil No. 18-01206 (WGY), 2020 WL 4437859 at *1 (D.P.R. 2020) (citing Bolling v. Sharpe, 347 U.S. 497, 499 (1954). Judge Young held, and the undersigning judge wholly agrees, that "[f]airness can sometimes be a notion too elusive or vague to furnish a satisfying legal rule. Yet that ideal, clothed in the constitutional garb of equal protection and due process, is also the supreme law of the land." Id. Fairness and equal justice under the law also permeate today's ruling.

Civil No. 18-1930 (GAG)

1
2
López-Correa has shown a freestanding actual-innocence claim because she lacked the criminal intent to aid and abet Mr. Acevedo Maldonado in the production of child pornography.

3
4
5
6
7
Similarly, *post-conviction* evidence has exposed that her first defense counsel provided ineffective assistance to Ms. López-Correa because she allowed her heavily medicated, depressed and borderline suicidal client agree into pleading guilty. According to the e-mail exchange already discussed, Ms. López-Correa allegedly preferred a plea "to avoid jail time" yet her trial attorney also worried that she could not withstand the rigors of a criminal trial. (Docket No. 1-2 at 1).

8
9
10
11
12
13
14
15
16
17
18
19
20
These conflicting assertions by themselves could amount to ineffective assistance of counsel because they illustrate how her defense attorney failed to recognize the extent to which an abused and complacent woman was willing to say and do anything in order to avoid going back to her unsettling life with Mr. Acevedo-Maldonado. It was not sound advice, within the range of reasonableness, to recommend a plea agreement "to avoid jail time" because the statutory minimum under 18 U.S.C. §§ 2251(a) and (2) mandates fifteen years of prison time and even though the Government can seek a lower sentence based on substantial assistance, it may still recommend imprisonment, as it did when it asked for seven years. (Crim No. 09-233 (GAG), Docket No. 129). Moreover, the trial attorney was aware of Ms. López-Correa's unstable mental health condition, suggested she may have not survived trial and yet went along a plea deal. Notably, Ms. López-Correa now remarks that: "Before pleading guilty, and afterwards, I was traumatized and depressed . . . I pled guilty because at that moment, I understood I had no alternative. I felt guilty, disgusting, dirty because of what he did to me and forced me to do." (Docket No. 1-3 at 2).

21
22
23
24
The Court further highlights that, at the change of plea colloquy, Ms. López-Correa struggled with the undersigning judge's line of questioning as to whether she voluntarily participated in the commission of the offense. Her defense counsel proceeded to reveal that she was "psychologically

Civil No. 18-1930 (GAG)

abused" and it was "hard" to admit she acted voluntarily. (Crim No. 09-233 (GAG), Docket No. 240 at 18). The question was rephrased to "volunteered and went along" with Mr. Acevedo-Maldonado for her to then respond affirmatively. Id. Chronologically, by the time of the change of plea hearing was held, the trial attorney had already sought Dr. Romey's expert report and Ms. López-Correa had been attending to psychiatric evaluation sessions with her. If, instead, then-counsel would have focused her efforts on demonstrating Ms. López-Correa's abusive past and concerning psychiatric condition *before* the change of plea hearing, then she could have "clear[ed] her name completely of charges," as she suggested in the sentencing memorandum. (Crim No. 09-233 (GAG), Docket No. 128 at 6-7).

The Government opposes this argument alleging that defense counsel never indicated that her client was incompetent to plead guilty because doing so would contradict her position that Ms. López-Correa could stand trial and present a duress defense to excuse her actions. (Docket No. 17 at 28). Moreover, the Government avers that at the change of plea hearing, Ms. López-Correa admitted all the requisite elements and that her statement under penalty of perjury attached to the pending motion "is not only incredible, but includes statements that are refuted by the record." Id. It concludes that counsel was not deficient and solely respected her clients own decision to plead guilty. Id. at 29.

The Court disagrees. Ms. López-Correa's competency to withstand trial and the fact that a duress defense could have been presented neither contradict nor cancel each other out. To the contrary, these arguments strengthen the proposition that her trial attorney had a uniquely situated defendant which required "thinking outside the box" to protect her actual-innocence. The fact that Ms. López-Correa has repeatedly "thanked God" for being arrested because she would have otherwise never left Mr. Acevedo-Maldonado and the "contradictory" testimony of admitting

31

Civil No. 18-1930 (GAG)

responsibility out of guilt, while also claiming innocence, can be readily explained through the
Battered Women Syndrome. See Linn, 929 N.W.2d at 744.

    The Court finds that Petitioner's defense counsel was aware that her client lacked both mental
competency (depression, anxieties and post-traumatic disorder) to understand the effects of pleading
guilty and the *mens rea* to commit the crime charged. In spite of a strong presumption in her favor,
counsel was presented with identifiable red flags that should have moved her not to advise Ms.
López-Correa to entertain a guilty plea that she would have otherwise not entered. Dunfee, 821 F.3d
at 128; United States v. Kenney, 756 F.3d 36, 47 (1st Cir. 2014). On its part, the Court acknowledges
that it should have delved more into the dosages of Ms. López-Correa's medication and further
evaluated Petitioner's competency based upon her demeanor. Yet, the Court was misled by "the
defendant's own assurance (and assurances from counsel) that the defendant's mind [was] clear."
United States v. Savinon-Acosta, 232 F.3d 265, 269 (1st Cir. 2000).

    Expanding on the ineffective assistance claims, the Court further reasons that not pursuing
duress and BWS defenses, before Ms. López-Correa's change of plea hearing, to explain the
pathological relationship with her abuser certainly undermined the confidence of the case's outcome.
See Frye, 566 U.S. at 148. As previously discussed, at the beginning of the proceedings, an
emergency motion was filed asserting that Ms. López-Correa's "mental state of mind may be a
defense" and "to ascertain her state of mind during the time of the relationship with co-defendant . . .
which impair[ed] her from personally helping in her defense." (Crim No. 09-233 (GAG), Docket
No. 31). The *post-conviction* expert report has proven that Ms. López-Correa suffers from BWS and
that her actions were consistent of a person under duress. López-Correa, 164 F. Supp. 3d at 267-68.
A timely presentation of an expert report as to these defenses before the Court, would have most

Civil No. 18-1930 (GAG)

1 definitely been relevant to establish Ms. López-Correa's actual innocence. See <u>Ramírez</u>, 2012 WL
2 733973 at 1; <u>Marenghi</u>, 893 F. Supp. at 94-95.

3      The Government opposes the duress and BWS defenses contending that the defense
4 attorney's legal strategy at sentencing adequately respond to her client's wishes. (Docket No. 17 at
5 31). It argues that even if Petitioner had presented these defenses, she had to carry the burden of
6 persuasion, which is not the same as being innocent. (Docket No. 17 at 31; 34). Additionally, the
7 Government puts forward that it would have introduced its own evidence to refute these contentions;
8 including victim impact statements, Ms. López Correa's degree of life independence and the fact
9 she even had, and filmed, sexual encounters with minors in Mr. Acevedo-Maldonado's absence. <u>Id.</u>
10 at 34-35.[10]

11      The Court has already reviewed and considered, specifically at the sentencing hearing, the
12 additional evidence that the Government would have submitted to rebut the duress and BWS
13 defenses. (Crim No. 09-233 (GAG), Docket No. 239 at 24). The Court considers that a reasonable
14 jury, as it did during Mr. Acevedo-Maldonado's trial, would have evaluated these submissions and
15 concluded that Ms. López-Correa's actions reflected the abusive, cyclical pattern ascribed to BWS
16 victims. Moreover, under the <u>Nwoye</u> test, Petitioner López-Correa would have displayed that her
17 "particular circumstances" of abuse and violence reasonably led her to film Mr. Acevedo-
18 Maldonado engaging in illicit sexual acts because: (1) she was "hypervigilant" of life threatening
19 cues (imminent harm) and (2) she could not escape his controlling power over her (no-reasonable-
20 alternative). <u>Nwoye</u>, 824 F.3d at 1137. As in <u>Dando</u>, the fact that Ms. López-Correa received a

21
22

23 _____
[10] At sentencing, the Court specifically inquired Petitioner why she filmed the victim when Mr. Maldonado-Acevedo
was not home. She responded that he instructed her to do so, and if she did not, he would beat her. Crim No. 09-233
24 (GAG), Docket No. 239 at 30 ).

Civil No. 18-1930 (GAG)

lenient sentence does not render the failure to investigate BWS and duress "a sound professional judgment." Dando 461 F.3d at 799-800.

Under both ineffective assistance of counsel claims, the Court holds that the outcome of the case would have been impacted, and even changed, had Ms. López-Correa been able to establish that she involuntarily entered a guilty plea, as she lacked the requite criminal intent, and that she would have successfully established a duress and BWS defense to excuse her actions. Accordingly, she has shown a gateway actual innocence claim because, once again, more likely than not, no reasonable juror would find her guilty beyond a reasonable doubt. House, 547 U.S. at 537.

## IV.    Conclusion

Therefore, after carefully considering all submissions, specifically all *post-conviction* testimony and record evidence, the Court hereby **GRANTS** the petition under 28 U.S.C. § 2255 at Docket No. 40 and **VACATES** Ms. Jennisse López-Correa's criminal conviction in Crim No. 09-233 (GAG) at Docket No. 71.

**SO ORDERED.**

In San Juan, Puerto Rico this 27th of August 2020.

> *s/ Gustavo A. Gelpí*
> GUSTAVO A. GELPI
> United States District Judge